**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. X:XX-cv-XXXXX**

**CLASS ACTION**

MSP RECOVERY CLAIMS, SERIES LLC,
and MSPA CLAIMS 1, LLC,

     Plaintiffs,

v.

MGA INSURANCE COMPANY, INC.,

    Defendant.

_____/

<u>**PLAINTIFFS' CLASS ACTION COMPLAINT FOR DAMAGES**</u>

1

Plaintiffs, MSP Recovery Claims, Series LLC ("MSPRC"), a Delaware entity and MSPA Claims 1, LLC ("MSPA"), a Florida limited liability company (collectively, "Plaintiffs"),  on behalf of itself and all others similarly situated (the "Class Members"), bring this action against MGA Insurance Company, Inc. ("Defendant"), and state as follows:

<u>**INTRODUCTION**</u>

1.      Defendant has systematically and uniformly failed to honor its primary payer obligations under 42 U.S.C. § 1395y, otherwise known as the Medicare Secondary Payer Act (the "MSP Law"), by failing to pay for or reimburse medical expenses resulting from injuries sustained in automobile and other accidents (the "accident-related medical expenses") that should have been paid by Defendant but, instead, were paid by Medicare and/or Medicare Advantage Plans, ("MAOs"). As a result, the cost of those accident-related medical expenses have been borne by Medicare and MAOs to the detriment of the Medicare Trust Funds and the public.

2.      More specifically, Defendant is an auto or other liability insurer that provides either no-fault or med-pay insurance to its customers, including Medicare beneficiaries enrolled under Part C of the Medicare Act ("Enrollees"). Pursuant to its contractual obligations with insureds, and under state law, Defendant is to provide coverage for its insureds' accident-related medical expenses on a "no-fault" basis (in other words, without regard for whether the insured was at fault for the accident). In the case of automobile and other accidents specifically involving Enrollees of MA Plans, Defendants are considered primary plans under the MSP Law. *See* 42 U.S.C. § 1395y(b)(2)(A) (defining "primary plan" to include a group health plan or large group health plan … a workmen's compensation law or plan, an automobile or liability insurance policy or plan (including a self-insured plan) or no-fault insurance); 42 C.F.R. § 411.21 (same). Accordingly, Defendant's obligation to pay for accident-related medical expenses on behalf of Enrollees is

primary relative to Medicare's obligation to pay for those same accident-related medical expenses, which is secondary. Defendant has systematically failed to make these payments and reimbursements, passing on those expenses to Medicare and MA Plans.

3.     Plaintiffs' Assignors are MAOs that provide Medicare benefits under the Medicare Advantage Program, otherwise known as Part C of the Medicare Act. MAOs provide such services pursuant to contracts with the Centers for Medicare & Medicaid Services ("CMS") in connection with which CMS pays the MAOs a fixed fee per Enrollee and the MAOs provide, at a minimum, the same benefits that Medicare beneficiaries enrolled under Part C of the Medicare Act ("Enrollees") would receive under traditional Medicare. MAOs stand on the same footing as traditional Medicare, including under the MSP Law, which declares that Medicare is a "secondary payer" to all other sources of coverage and, consequently, are empowered to recoup from rightful primary payers if they pay for services that fell within overlapping insurance maintained by Enrollees with a primary payer.

4.     The overriding purpose of the MSP Law is to ensure that Medicare and MAOs do not pay for medical expenses on behalf of Medicare beneficiaries that should be paid instead by primary payers such as Defendant. Without the provisions in the MSP Law establishing a private right of action against primary payers, there would exist no mechanism to ensure that primary payers hold up their end of the bargain and pay the medical expenses associated with any accident-related injuries and/or treatments.   Indeed, Medicare and MAOs, which are required to conditionally pay for accident-related medical expenses, would be left to bear the burden and overwhelming expense of such injuries and treatments.

5.     In addition to their obligation to pay or reimburse Medicare and MAOs for accident-related medical expenses on behalf of their Enrollees, primary payers like Defendant have

an affirmative burden, under applicable federal regulations promulgated under the MSP Law, to: (i) identify whether their insureds are Medicare beneficiaries; and (ii) report their primary payer responsibility to CMS.

6.      Even in the face of the MSP Law's clear legal requirement that primary payers like Defendant pay for accident-related medical expenses, take steps to identify whether their Enrollees are Medicare beneficiaries, and report their primary payer responsibility to CMS, primary payers often take steps to ensure that the burden of those accident-related medical expenses is borne by Medicare and MAOs.

7.      In large part, the deliberate and systematic avoidance of payment and/or reimbursement obligations under the MSP Law by Defendant, and primary payers in general, has been successful in its primary objective – to pass on accident-related medical expenses to Medicare and MAOs, including Plaintiffs' Assignors and the Class Members.

8.      To remedy this problem, Congress provided a private right of action to any private entity or individual to enforce the MSP Law and remedy a primary payer's failure to reimburse conditional payments made by Medicare or MAOs, and provided for the recovery of double damages for instances in which primary payers have failed to honor their payment and/or reimbursement obligations under the MSP Law.

9.      Plaintiffs utilize a proprietary system that matches the health care claims data from their Assignors to the publicly available reporting data from CMS and police crash and incident reports available in limited jurisdictions, as well as the claims data made available by primary payers like Defendant, either voluntarily through a coordination of benefits process or by judicial compulsion in a data matching process that has proven successful in identifying primary payers' wrongdoing, to automate the process of identifying instances in which primary payers like

Defendant fail to honor their obligations under the MSP Law.

10.     As described in detail below, Plaintiffs' Assignors and the Class Members have each suffered an injury-in-fact as a result of Defendant's failure to meet its statutory payment and reimbursement obligations. This lawsuit seeks to remedy that wrong and advance the interests of the MSP Law and Medicare, because when MAOs recover conditional payments they "spend less on providing coverage for their enrollees" and the "Medicare Trust Fund . . . achieve[s] cost savings." *In re Avandia Mktg., Sales Practices & Products Liab. Litig.*, 685 F.3d 353, 365 (3d Cir. 2012).

11.     This action seeks redress for Defendant's flagrant and systematic failure to comply with the MSP Law.

## PARTIES, JURISDICTION AND VENUE

12.     Plaintiff MSPRC is a Delaware series limited liability company with a principal place of business located at 2701 S. Lejeune Rd., 10th Floor Miami, FL 33134. Plaintiff MSPRC's limited liability company agreement provides for the establishment of one or more designated series. All records of all series are maintained together with all assets of Plaintiff MSPRC.

13.     Plaintiff MSPRC has established various designated series pursuant to Delaware law in order to maintain various claims recovery assignments separate from other Company assets, and in order to account for and associate certain assets with certain particular series. All designated series form a part of Plaintiff MSPRC and pursuant to Plaintiff MSPRC's limited liability agreement and applicable amendment(s), each designated series will be owned and controlled by Plaintiff MSPRC. Plaintiff MSPRC may receive assignments in the name of Plaintiff MSPRC and further associate such assignments with a particular series, or may have claims assigned directly to a particular series. In either event, Plaintiff MSPRC maintains the right to sue on behalf of each

series and pursue any and all rights, benefits, and causes of action arising from assignments to a series. Any claim or suit may be brought by Plaintiff MSPRC in its own name or it may elect to bring suit in the name of its designated series.

14.     Plaintiff MSPRC's limited liability agreement provides that any rights and benefits arising from assignments to its series shall belong to Plaintiff MSPRC.

15.     Plaintiff MSPA is a limited liability company with its principal place of business located at 2701 S. Le Jeune Road, 10th Floor, Coral Gables, Florida 33134.

16.     Defendant is a for-profit corporation formed under the laws of the State of Texas, and whose principal place of business and corporate headquarters is located in Dallas, TX.

17.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 (federal question).

18.     This court has personal jurisdiction over Defendant as Defendant: (a) has contracted to insure a person, property, or risk located within this state at the time of contracting; and (b) operates, conducts, and carries on a business venture in the State of Florida.  As set forth in greater detail below, the D.H. and J.W. claims arise from Defendant's conduct within this state.  In addition, upon information and belief, one or more of the instances in which Plaintiffs' Assignors paid for accident-related medical expenses that Defendant should have paid, and in which Defendant neither paid nor reported its primary payer responsibility, arose as a result of Defendant's conduct within this state.

19.     Further, Defendant maintains sufficient minimum contacts with the State of Florida so as to not offend traditional notions of fair play and substantial justice. Defendant maintains and carries on systematic and continuous contacts in this judicial district, regularly transacts business within this judicial district, and regularly avails itself of the benefits of this judicial district.

Defendant has purposefully availed itself of the privilege of conducting activities within the State of Florida, thus invoking the benefits and protections of its laws. Defendant's purposeful availment was such that it should have reasonably anticipated being hauled into court in this forum.

20.     At all times herein mentioned, Defendant was authorized to do or otherwise engage in business within the State of Florida and did in fact offer insurance policies that contain liability, no-fault and/or medical payments ("Med Pay") coverage for any accident-related medical expense within the State of Florida and elsewhere.

21.     Venue is proper under 28 U.S.C. §§ 1391 in the Southern District of Florida because it is the district in which the cause of action accrued.

### GENERAL ALLEGATIONS

22.     This lawsuit arises from Defendant's systematic and uniform failure to reimburse conditional payments made by Plaintiffs' Assignors and the Class Members for accident-related medical expenses.

23.     Defendant's liability to reimburse such conditional payments ordinarily arises in one of two contexts: (i) where Defendant is obligated to pay for the specific accident-related medical expenses in the first instance under a "no-fault" insurance policy; or (ii) where Defendant has entered into settlement agreements with Medicare beneficiaries as a result of claims arising under liability insurance policies[1] issued by Defendant.

24.     On behalf of themselves and the Class Members, Plaintiffs seek, *inter alia*, double damages under the MSP Law's private cause of action for Defendant's failure to properly reimburse conditional payments for Enrollees' accident-related medical expenses.

25.     Defendant has failed to fulfill its statutory duties as "no-fault" insurers.

---

[1] Liability insurance plans are considered primary plans under 42 U.S.C. § 1395y(b)(2).

Specifically, Defendant has systematically and uniformly failed to pay or reimburse conditional payments by Plaintiffs' Assignors and Class Members on behalf of Enrollees for accident-related medical expenses that should have been covered by Defendant. The Enrollees are Medicare beneficiaries who were enrolled in Medicare Advantage health plans offered or managed by Plaintiffs' Assignors and Class Members, all of which are MAOs. Plaintiffs' Assignors and the Class Members suffered an injury-in-fact from Defendant's failure to reimburse, and accordingly have standing to sue under 42 U.S.C. §1395y(b)(3)(A).

26.     Plaintiffs' Assignors and the Class Members provided Medicare benefits to the Enrollees. In numerous instances, the Enrollees suffered injuries related to an accident in connection with which Plaintiffs' Assignors and the Class Members paid for accident-related medical expenses.[2] Because Enrollees were also covered by no-fault policies issued by Defendant, Defendant is a primary payer under the MSP Law and either should have paid the accident-related medical expenses directly or should have reimbursed Plaintiffs and the Class Members for the conditional payments they made.

27.     Defendant has also failed to fulfill its statutory duties upon entering settlements with Enrollees. Specifically, Defendant has entered into settlement agreements with Medicare beneficiaries as a result of claims arising under liability insurance policies issued by Defendant. Accordingly, Defendant is a primary payer under the MSP Law and either should have directly

---

[2] MAOs are required to promptly pay "clean claims" for medical expenses presented by healthcare providers so that Medicare beneficiaries are not faced with the burden of having to pay such expenses with the hopes of being reimbursed by a primary payer like Defendant. MAOs cannot reasonably expect that a primary payer is liable for such expenses and/or will pay such expenses in a prompt fashion. Accordingly, any payments made by MAOs, and Medicare for that matter, for accident-related medical expenses are conditional payments subject to reimbursement by a responsible primary payer.

paid the accident-related medical expenses or should have reimbursed Plaintiffs' Assignors and the Class Members for the conditional payments they made.

28.     Rather than honor its obligations under the MSP Law, Defendant systematically and deliberately takes steps to avoid having to pay the accident-related medical expenses paid by Plaintiffs' Assignors and the Class Members on behalf of the Enrollees. These steps include failing to report its primary payer responsibility to CMS. Moreover, Defendant fails to coordinate benefits with MAOs, including specifically with Plaintiffs on behalf of Plaintiffs' Assignors.[3]

29.     Defendant's deliberate non-compliance with reporting requirements under the MSP Law and refusal to coordinate benefits with MAOs are designed to avoid detection as the primary payer responsible for Enrollees' accident-related medical expenses by the Enrollees and, ultimately, avoid having to pay or reimburse conditional payments for such accident-related medical expenses.

30.     Upon information and belief, Defendant has failed to report its primary payer responsibility and failed to pay and/or reimburse one or more of the conditional payments made by Plaintiffs' Assignors for accident-related medical expenses on behalf of their Enrollees, for which Defendant has a demonstrated responsibility to pay under the MSP Law.

31.     Using the proprietary system designed and developed by Plaintiffs' related entity, MSP Recovery, LLC (the "MSP System"), Plaintiffs can capture, compile, synthesize, and funnel

---

[3] Prior to the filing of this lawsuit, Plaintiffs sent correspondence seeking to coordinate benefits with Defendants. Defendants' counsel responded and expressly rejected Plaintiffs' efforts to coordinate benefits. That is, Defendant refused to "provide notice [to Plaintiffs] about [their] primary payment responsibility and information about the underlying MSP situation[.]" 42 C.F.R. § 411.25(a). Further, Defendants refused to "describe the specific situation and the circumstances (including the particular type of insurance coverage as specified in §411.20(a)) and, if appropriate, the time period during which [Defendants were] primary to [Plaintiffs]." 42 C.F.R. § 411.25(b).

large amounts of data, which data is kept in the standard format for storing digital health insurance claims data, or electronic data interchange ("EDI"), called 837P ("837")[4], to identify claims where Defendant has failed to honor its primary payer responsibilities on a class-wide basis.

32. The MSP System utilizes ICD-9 or ICD-10 CM medical diagnosis codes and DRGs, ICD-9, ICD-10 PCS, HCPCS, or CPT procedure codes to identify and obtain information regarding an Enrollee's claim, such as the type of injury suffered, the circumstances that caused the injury, whether the listed primary insurance provider made payment, and whether the insurance carrier was a liability provider.

33. The MSP System captures data from different sources, including data acquired from outside sources like CMS and data found in publicly-available police crash and incident reports, to identify conditional payments made by Plaintiffs' Assignors for their Enrollees' accident-related medical expenses, which should have been reimbursed by Defendant. This claims identification process can also be applied class-wide to the data obtained from Class Members.

34. Using the MSP System, Plaintiffs have identified multiple instances in which Plaintiffs' Assignors made conditional payments for accident-related medical expenses which should have been paid and/or reimbursed by Defendant. Plaintiffs' Assignors and the Class Members have each suffered an injury-in-fact as a result of Defendant's failure to meet its statutory payment and reimbursement obligations, including after Defendant has entered into a settlement.

35. Plaintiffs have identified numerous instances where Defendant admitted, by reporting to CMS, that it was contractually obligated (pursuant to no-fault and liability insurance

---

[4] A detailed explanation of CMS' standard for storing digital health insurance claims data is set forth in **Appendix 1** to this Complaint. *See also* Centers for Medicare and Medicaid Services, Medicare Learning Network, Medicare Billing: Form CMS-1500 and the 837 Professional (July 2019), *available at* https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/837P-CMS-1500.pdf.

policies) to provide primary payment on behalf of Enrollees for conditional payments made by Plaintiffs' Assignors in connection with accident-related medical expenses that Defendant should have paid or reimbursed. A list of such instances is attached hereto as **Exhibit A**.

36.    The instances include numerous instances where Defendant is also identified in police crash and incident reports[5] as the insurer contractually obligated (pursuant to no-fault and liability insurance policies) to provide primary payment on behalf of Enrollees for conditional payments made by Plaintiffs' Assignors.

37.    The MSP System also identifies numerous other instances in which Plaintiffs' Assignors made conditional payments on behalf of Enrollees for which the proper primary payer cannot be identified because (i) the primary payer has failed to report its primary payer responsibility as required by the MSP Law, or (ii) police crash and incident reports that would identify the appropriate primary payer are not available to Plaintiffs in the jurisdiction in which the accident occurred. Utilizing the MSP System to perform data-matching of Plaintiffs' Assignors' EDI with Defendant's EDI, however, would allow Plaintiffs to identify with specificity those unreimbursed conditional payments for accident-related medical expenses.

38.    Plaintiffs have standing to assert claims for those specific exemplars identified below, as well as for the greater universe of instances for which Defendant has failed to pay and/or reimburse conditional payments made by Plaintiffs' Assignors.

39.    Numerous Assignors have assigned their recovery rights to assert the causes of action alleged in this Complaint to series of Plaintiff MSPRC.[6]  Plaintiff MSPRC maintains the

---

[5] Police crash and incident reports are only publicly available in a handful of jurisdictions, including Florida, Texas, Ohio, Georgia and Connecticut.

[6] The assignments to the various series LLCs of Plaintiff MSPRC are alleged in detail in **Appendix 2** to this Complaint. All of those assignments are valid and binding contracts, and confer standing on Plaintiff MSPRC to pursue the claims asserted herein.

legal right to sue on behalf of each of its designated series. Specifically, pursuant to Plaintiff MSPRC's limited liability agreement, as amended, all rights arising from the assignment to its series, along with the right to bring any lawsuit in connection with said assignment, belongs to Plaintiff MSPRC:

> Without limiting the foregoing, the Company's purposes include owning and pursuing claims recovery and reimbursement rights assigned to the Company or any of its designated series, by Medicare Advantage Organizations … and other health care organizations or providers authorized by state or federal law … to pay for, provide or arrange for the provision of medical and health care services or supplies to persons, including but not limited to those who are covered under government healthcare programs such as Medicare, Medicare Advantage or Medicaid. The Company will own the assigned rights but may segregate the assignments by establishing series interests pursuant to Title 6, § 18-215 of the Delaware Code to serve as units of the Company. **For avoidance of doubt, the Company is authorized to pursue or assert any claim or suit capable of being asserted by any designated series arising from, or by virtue of, an assignment to a designated series.**

Section 2 of Second Amendment of Limited Liability Company Agreement of MSP Recovery Claims, Series LLC (amending Section 2.3, entitled "Purpose," to include the language quoted above) (emphasis added). As such, Plaintiff MSPRC has the right and authority to seek reimbursement of Medicare payments made by the Assignors that should have been paid, in the first instance, by Defendant.

40.    In addition to Plaintiff MSPRC, Plaintiff MSPA also has standing to pursue claims on behalf of its Assignor, as set forth in greater detail in **Appendix 2**.

41.    Each of the individual claims set forth herein has been assigned to Plaintiffs. The claims are not subject to any carveouts, exclusions, or any other limitations in law or equity that would impair Plaintiffs' right to bring this cause of action.

42.    The allegations set forth herein plainly demonstrate that Plaintiffs' Assignors suffered damages as a direct result of Defendant's individual failure to reimburse conditional

payments as required under the MSP Law.

43.     In addition, Section 1395y(a)(1)(A) of the Medicare statute states that, "no payment may be made under [the Medicare statute] for any expenses incurred for items or services which … are not reasonable and necessary for the diagnosis or treatment of illness or injury."

44.     Because this section contains an express condition of payment – that is, "no payment may be made" – it explicitly classifies each Medicare payment for a particular item or service be "reasonable and necessary."

45.     Once an MAO (or Medicare Payer) makes a payment for medical items and services on behalf of its Enrollees, the payment is conclusive proof that the items and services were reasonable and necessary.

46.     The items and services received by and paid on behalf of Plaintiffs' Assignors' Enrollees, including D.H. and J.W. below, were reasonable and necessary to treat the injuries suffered by each of the Enrollees.

47.     Plaintiffs set forth the exemplars below to illustrate Defendant's systematic and uniform failure to: (i) fulfill its statutory duties as a "no-fault"; and (ii) fulfill its statutory duties when entering into settlements. In each of these cases, Defendant has reported and admitted its primary payer responsibility for the accident-related medical expenses for medical items and/or services provided to the Enrollees within ten (10) days of the accident and for which Plaintiffs' Assignors made conditional payments.

### *The D.H. claim demonstrates Plaintiff's right to recover for Defendant's failure to meet its reimbursement obligations under the MSP Law*

48.     On July 27, 2014, D.H. was enrolled in a Medicare Advantage Plan issued and administered by Florida Healthcare Plus, Inc. ("FHCP"). FHCP is an MAO.

49.     On July 27, 2014, D.H. was injured in an accident. At the time of the accident,

D.H.'s accident-related medical costs and expenses were also covered under a no-fault policy issued by Defendant. By virtue of its no-fault policy Defendant was contractually obligated to pay and provide primary coverage for D.H.'s accident-related medical expenses.

50.　As a direct and proximate result of the accident, D.H. sustained injuries that required medical items and services.

51.　A list of the diagnosis codes and injuries assigned to D.H. in connection with D.H.'s accident-related treatment is attached hereto as **Exhibit B**. The medical services were rendered on July 27, 2014.

52.　The medical providers subsequently issued bills for payment of the accident-related medical expenses to D.H.'s MAO, FHCP.

53.　As D.H.'s MAO, FHCP was fully responsible for all medical expenses incurred by D.H. FHCP paid $52.03 for D.H.'s accident-related medical expenses. The medical provider actually billed and charged FHCP $1,095.00 for D.H.'s accident-related medical expenses.

54.　Defendant is liable to pay this amount because it was D.H.'s primary payer by virtue of a no-fault insurance policy which covered D.H. for the accident-related medical expenses detailed herein.

55.　In fact, Defendant reported and admitted to CMS that it was the primary payer for D.H., including information regarding the accident, the name of the reporting entity, and the type of insurance policy involved.

56.　This reporting demonstrates that Defendant was aware of the accident and its responsibility to reimburse D.H. Despite Defendant reporting that it was a primary payer, and the corresponding admission that it should have paid for D.H.'s accident-related injuries, Defendant failed to do so, giving rise to a claim under the MSP Law.

57.     Accordingly, Plaintiff MSPA is entitled to collect double damages against Defendant for its failure to reimburse FHCP's conditional payment for D.H.'s accident-related expenses.

### *The J.W. claim demonstrates Plaintiff's right to recover for Defendant's failure to meet its reimbursement obligations under the MSP Law*

58.     On October 5, 2012, J.W. was enrolled in a Medicare Advantage Plan issued and administered by Avmed, Inc. ("AVDI").  AVDI is a MAO.

59.     On October 5, 2012, J.W. was injured in an accident.  The tortfeasor responsible for the accident was insured by Defendant under a liability insurance policy.

60.     As a direct and proximate result of the accident, J.W. sustained injuries that required medical items and services.

61.     A list of the diagnosis codes and injuries assigned to J.W. in connection with J.W.'s accident-related treatment is attached hereto as **Exhibit C**.

62.     The medical providers subsequently issued bills for payment of the accident-related medical expenses to J.W.'s MAO, AVDI.

63.     As J.W.'s MAO, AVDI was fully responsible for all medical expenses incurred by J.W. AVDI paid $15,786.91 for J.W.'s accident-related medical expenses. The medical provider actually billed and charged AVDI $39,121.38. for J.W.'s accident-related medical expenses.

64.     Following J.W.'s claim against Defendant's insured, Defendant indemnified its insured tortfeasor and made payments pursuant to a settlement with J.W. By entering into that settlement and releasing all claims, Defendant became a primary payer and subject to liability for J.W.'s accident-related medical expenses.

65.     In fact, Defendant reported and admitted to CMS that it was the primary payer for J.W., including information regarding the accident, the name of the reporting entity, and the type

of insurance policy involved.

66.     This reporting demonstrates that Defendant was aware of the accident and its responsibility to reimburse AVDI. Despite Defendant reporting that it was a primary payer, and the corresponding admission that it should have paid for J.W.'s accident-related injuries, Defendant failed to do so, giving rise to a claim under the MSP Law.

67.     Accordingly, Plaintiff MSPRC is entitled to collect double damages against Defendant for its failure to reimburse AVDI's conditional payments for J.W.'s accident-related expenses.

68.     Upon receipt of the settlement agreement between Defendant and J.W., Plaintiff reserves the right to amend this Complaint to pursue reimbursement for J.W.'s medical expenses against any of Defendant's affiliates that entered into a release with J.W.

## CLASS ALLEGATIONS

69.     This matter is brought as a class action pursuant to Federal Rule of Civil Procedure 23, on behalf of all Class Members or their assignees who paid for their beneficiaries' accident-related medical expenses, when Defendant should have made those payments as primary payers in the first instance or reimbursed the Class Members.

70.     As discussed in this class action Complaint, Defendant has failed to provide primary payment and/or appropriately reimburse the Class Members for money they were statutorily required to pay under the MSP Law. This failure to reimburse applies to Plaintiffs, as the rightful assignee of those organizations that assigned their recovery rights to Plaintiffs, and to all Class Members. Class action law has long recognized that when a company engages in conduct that has uniformly harmed a large number of claimants, class resolution is an effective tool to redress the harm. This case is well suited for class-wide resolution.

71.     Class Members have been unlawfully burdened with paying for the medical costs of their beneficiaries when the law explicitly requires Defendant to make such payments. The Medicare Act and its subsequent amendments were constructed to ensure an efficient and cost-effective system of cooperation and communication between primary and secondary payers. Defendant's failure to reimburse Plaintiffs and Class Members runs afoul of the Medicare Act and has directly contributed to the ever-increasing costs of the Medicare system.

72.     The Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, adequacy, and ascertainability shown as follows:

a.     **Numerosity**:   Joinder of all members is impracticable. Upon information and belief, there are hundreds of MAOs and first tier entities (including their assignees) throughout the United States who (1) were not reimbursed by Defendant under a policy which provided PIP or Med Pay coverage for medical expenses arising out of accidents or (2) were not reimbursed by Defendant after they entered into a settlement with a Medicare beneficiary enrolled in a MA Plan administered by an MAO. Thus, the numerosity element for class certification is met.

b.     **Commonality**: Questions of law and fact are common to all members of the Class. Specifically, Defendant's misconduct was directed at all Class Members, their affiliates, and those respective organizations that contracted with CMS and were identified as "secondary payers" by Medicare Part C. Defendant failed to reimburse conditional payments, report settlements and report their Ongoing Responsibility for Medicals ("ORM") involving clients who were Medicare beneficiaries, and ensure that Medicare remained a secondary payer, as a matter of course. Thus, all

17

Class Members have common questions of fact and law, *i.e.*, whether Defendant failed to comport with their statutory duty to pay or reimburse MAOs pursuant to the MSP Law. Each Class Member shares the same needed remedy, *i.e.*, reimbursement. Plaintiffs seek to enforce its own rights, as well as the reimbursement rights of the Class Members, for medical payments made on behalf of their Enrollees, as a result of Defendant's practice and course of conduct in failing to make primary payment or properly providing appropriate reimbursement.

c. **<u>Typicality</u>**:  Plaintiffs' claims are typical of the Class Members' claims, as all have been damaged in the same manner. Plaintiffs' and the Class Members' claims have the same essential characteristics, arise from the same course of conduct, and share the same legal theory. As the putative class representative, Plaintiffs possess the same interests and suffered the same injury as the other Class Members, thereby demonstrating a legally sufficient nexus between Plaintiffs' claims and the Class Members' claims. Plaintiffs' claims are typical of the Class Members' claims because Defendant failed to make primary payments for Enrollees' accident-related medical expenses, which they were obligated to do by their settlements or contractual obligations with Enrollees. Plaintiffs' claims are typical because Plaintiffs, like the Class Members, has a right to relief for Defendant's failure to make primary payments or reimburse Plaintiffs and the Class Members for their conditional payments of Enrollees' accident-related medical expenses. Plaintiffs' and the Class Members' claims are based on the same statutes, regulations, legal theories and factual situations. Defendant's business practices, acts and omissions are materially the same with respect to Plaintiffs' and the Class Members' claims, as will be

Defendant's legal defenses. Plaintiffs' claims are, therefore, typical of the Class.

d. **Adequacy**: Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs' interests in vindicating these claims are shared with all members of the Class and there are no conflicts between the named Plaintiffs and the Class Members. In addition, Plaintiffs are represented by counsel who are competent and experienced in class action litigation and also have no conflicts.

e. **Ascertainability**: Locating members of the Class would be relatively simple, since CMS maintains records of all MAOs, first tier entities, and downstream entities, and providing notice to such entities could be accomplished by direct communication.

73. The Class is properly brought and should be maintained as a class action under Rule 23(b)(3) because a class action in this context is superior. Pursuant to Rule 23(b)(3), common issues of law and fact predominate over any questions affecting only individual members of the Class ("Damages Class"). Defendant, whether deliberately or not, failed to make required payments under the MSP Law and failed to reimburse Class Members and those organizations that assigned their recovery rights to Plaintiffs, thus depriving Plaintiffs, as assignee of the right to recovery, and Class Members of their statutory right to payment and reimbursement.

74. It is the custom and practice of CMS and primary plans to maintain records in a detailed electronic format. Based on these practices, Plaintiffs maintain a reasonable methodology for generalized proof of class-wide impact using the MSP System. The MSP System captures, compiles, synthesizes and analyzes large amounts of data to identify claims for reimbursement of conditional payments. This case will not present manageability problems as compared to non-electronic data driven class actions. There is no need for a fact-specific individual analysis of intent

or causation, and damages will be calculated based upon the total fee-for-service amounts associated with the payments made on behalf of Enrollees. Plaintiffs are capable of using the MSP System to identify and quantify Class Members' claims, as it has done for its own claims.

75.     Proceeding with a Damages Class is superior to other methods for fair and efficient adjudication of this controversy because, *inter alia*, such treatment will allow a large number of similarly-situated assignors to litigate their common claims simultaneously, efficiently, and without the undue duplications of effort, evidence, and expense that several individual actions would induce; individual joinder of the individual members is wholly impracticable; the economic damages suffered by the individual class members may be relatively modest compared to the expense and burden of individual litigation; and the court system would benefit from a class action because individual litigation would overload court dockets and magnify the delay and expense to all parties. The class action device presents far fewer management difficulties and provides the benefit of comprehensive supervision by a single court with economies of scale.

76.     Administering the proposed Damages Class will be relatively simple. Defendant provided no-fault and other liability policies to claimants who are also Medicare beneficiaries. Once that data identifying these policies is compiled and organized, Plaintiffs can determine which policyholders were Medicare beneficiaries during the applicable time. Then, using the database, Plaintiffs and the Class Members can identify unreimbursed payments made for accident-related medical expenses where Defendant were primary payers.

## CLASS DEFINITION

77.     The putative class (referred to herein as "Class Members") is defined as:

### Contractual Obligations Class

All Medicare Advantage Organizations (or their assignees) that provide benefits under Medicare Part C, in the United States of America and its territories, who made payments for a Medicare Enrollee's medical items and services within the last six years from the filing of the complaint where Defendant:

(1) is the primary payer by virtue of having a contractual obligation to pay for the items and services that are required to be covered by the policy of insurance of the same Medicare Enrollees; and

(2) failed to pay for the items and services or otherwise failed to reimburse Medicare Advantage Organizations (or their assignees) for the items and services that were provided related to the claims of the Medicare Enrollees;

This class definition excludes (a) Defendant, their officers, directors, management, employees, subsidiaries, and affiliates; and (b) any judges or justices involved in this action and any members of their immediate families.

### Settlement Class

All Medicare Advantage Organizations (or their assignees) that provide benefits under Medicare Part C, in the United States of America and its territories, who made payments for a Medicare Enrollee's medical expenses where Defendant:

(1) is the primary payer by virtue of having settled a claim with a Medicare Advantage Plan Enrollee;

(2) settled a dispute to pay for medical expenses with a Medicare Advantage Plan Enrollee; and

(3) failed to reimburse Medicare Advantage Organizations (or their assignees) for their conditional payments upon settling with a Medicare Enrollee.

This class definition excludes (a) Defendant, their officers, directors, management, employees, subsidiaries, and affiliates; and (b) any judges or justices involved in this action and any members of their immediate families.

78.     All conditions precedent to the filing of this lawsuit have occurred, been performed,

or have been otherwise waived by Defendant.

### CAUSES OF ACTION

### COUNT I
### Private Cause of Action Under 42 U.S.C. § 1395y(b)(3)(A)

79.     Plaintiffs incorporate by reference paragraphs 1 through 98 of this Complaint.

80.     Plaintiffs assert a private cause of action pursuant to 42 U.S.C. § 1395y(b)(3)(A) on behalf of itself and all similarly-situated parties.

81.     The elements of a cause of action under 42 U.S.C. § 1395y(b)(3)(A) are: (1) the Defendant's status as a primary plan; (2) the Defendant's failure to provide for primary payment or appropriate reimbursement; and (3) damages. *Humana Med. Plan, Inc. v. W. Heritage Ins. Co.*, 832 F.3d 1229, 1239 (11th Cir. 2016).

82.     Defendant's no-fault policies are primary plans, which rendered the Defendant a primary payer for accident-related medical expenses.

83.     As part of providing Medicare benefits to Medicare beneficiaries enrolled under the Medicare Advantage program, the Plaintiffs' Assignors paid for items and services which were also covered by no-fault policies issued by Defendant.

84.     More specifically, Plaintiffs' Medicare beneficiaries were also covered by no-fault, PIP, or medical payments policies issued by the Defendant.

85.     In addition, Defendant entered into settlements with Enrollees relating to accidents, but failed to reimburse Plaintiffs' Assignors for accident-related medical expenses paid by Plaintiffs' Assignors on behalf of the Enrollees. Defendant is liable for reimbursement of these accident-related medical expenses even if they subsequently paid out the maximum benefits under the policies.

86.     Because the Defendant is a primary payer, the Medicare payments for which Plaintiffs seek reimbursement were conditional payments under the MSP Law.

87.     Defendant was required to timely reimburse the Assignors for their conditional payments of the Enrollees' accident-related medical expenses. See 42 U.S.C. § 1395y(b)(2)(ii); 42 C.F.R. § 411.22(b)(3); *MSP Recovery, LLC v. Allstate Ins. Co.*, 835 F.3d 1351, 1355 (11th Cir.

2016). Defendant failed to do so.

88.     Plaintiffs have suffered money damages as a direct result of Defendant's failure to reimburse the accident-related medical expenses.

89.     Defendant has derived substantial profits by placing the burden of financing medical treatments for their policy holders upon the shoulders of Plaintiffs' Assignors.

90.     In this case, Defendant failed to administratively appeal the Assignors' rights to reimbursement within the administrative remedies period. Defendant, therefore, is time-barred from challenging the propriety or amounts paid.

91.     Plaintiffs bring this claim pursuant to 42 U.S.C. § 1395y(b)(3)(A), to recover double damages from Defendant for its failure to make appropriate and timely reimbursement of conditional payments for the Enrollees' accident-related medical expenses.

## JURY TRIAL DEMAND

92.     Plaintiffs demand a trial by jury on all of the triable issues within this pleading.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class Members described herein, pray this Court issues a judgment against Defendant for the following relief:

    a.   find that this action satisfies the prerequisites for maintenance of a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), and certify the respective Class;

    b.   designate Plaintiffs as representative for the respective Class Members and Plaintiffs' undersigned counsel as Class Counsel for the respective Class; and

    c.   issue a judgment against Defendant:

        i.   granting Plaintiffs and the Class Members reimbursement of double damages for those monies to which the Class is entitled under 42 U.S.C. § 1395y(b)(3)(A), as alleged in Count I;

      iii.     granting Plaintiffs and the Class Members pre-judgment and post-judgment interest consistent with the statute; and

      iv.     granting Plaintiffs and the Class Members such other and further relief as the Court deems just and proper under the circumstances.

Dated: April 17, 2019         Respectfully Submitted,

*/s/ Francesco A. Zincone*

Francesco A. Zincone, FL Bar No. 100096

**ARMAS BERTRAN PIERI**

4960 SW 72nd Avenue, Suite 206

Miami, Florida 33155

Telephone:    (305) 461-5100

Facsimile:    (786) 221-2903

fzincone@armaslaw.com

## APPENDIX 1

### CMS' Standard for Storing Digital Health Insurance Claims Data

1. It is the custom and practice of CMS and primary plans to maintain records in a detailed electronic format. According to the U.S. Department of Health and Human Services (HHS), CMS, federal statutes, and industry best practices and guidelines, the standard format for storing digital health insurance claims data is an electronic data interchange ("EDI") format called 837P ("837").

    a. The 837 standard is mandated by the federal government and used federal and state payors such as Medicare and Medicaid.

    b. The 837 standard is also used by private insurers, hospitals, clinics, physicians and other health care providers (i.e., HIPAA covered entities) who typically adopt CMS standards.

    c. Paper claims are captured in the CMS 1500, UB04, and UB92 forms, but electronically, the standard for storing data is the 837 format.

2. Essential components of an 837-claim file include but are not limited to the date(s) of service, diagnosis code(s) and medical procedure code(s).

    a. <u>Dates (including dates of service)</u>: the standard format for dates in electronic health care claims is YYYYMMDD, CCYYMMDD, or MM/DD/YYYY.

        i. According to industry best practices and guidelines, and HHS and CMS, the standard format for expressing dates in healthcare insurance claims data is CCYYMMDD (CC representing two numeric digits to indicate Century, YY representing two numeric digits for year, MM representing two digits for the month, and DD representing two digits for the day of the month).

Sometimes this is alternately expressed as YYYYMMDD.[7]

ii.  The CCYYMMDD date format standard has been in place for many years. *See* CMS Guidance for 2010[8], 2011[9], 2012[10], 2013[11], 2014[12], and 2016.[13]

iii.  CMS has also accepted the MM/DD/YYYY format for its local coverage determination data.[14]

---

[7] *See* the Medicare Claims Processing Manual Chapter 3 and CMS Manual System, Pub 100-08 Medicare Program Integrity, Transmittal 721.

[8] CMS Manual System, Pub 100-20 One-Time Notification, Transmittal 761 (Aug. 20, 2010), *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/downloads/R761OTN.pdf.

[9] CMS Manual System, Pub 100-20 One-Time Notification, Transmittal 988 (Oct. 28, 2011), *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/downloads/R988OTN.pdf.

[10] CMS Manual System, Pub 100-20 One-Time Notification, Transmittal 1050 (Feb. 29, 2012), *available at*  https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R1050OTN-.pdf.

[11] CMS Manual System, Pub 100-20 One-Time Notification, Transmittal 1277 (Aug. 9, 2013), *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/downloads/R1277OTN.pdf.

[12] Memorandum from Tracey McCutcheon, Acting Director, Medicare Drug Benefit and C & D Data Group, and Laurence Wilson, Director, Chronic Care Policy Group, to All Part D Plan Sponsors and Medicare Hospice Providers (Mar. 10, 2014) (on file with author), *available at* https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/Hospice/Downloads/Part-D-Payment-Hospice-Final-2014-Guidance.pdf.

[13] Memorandum from Cheri Rice, Director, Medicare Plan Payment Group, and Cathy Carter, Director, Enterprise Systems Solutions Group, to All Medicare Advantage, Prescription Drug Plan, Cost, PACE, and Demonstration Organizations Systems Staff (Nov. 9, 2016) (on file with author), *available at* https://www.cms.gov/Research-Statistics-Data-and-Systems/CMS-Information-Technology/mapdhelpdesk/Downloads/Announcement-of-the-February-2017-Software-Release.pdf.

[14] Local Coverage Determination (LCD) Date of Service Criteria, *available at* https://www.cms.gov/medicare-coverage-database/search/lcd-date-search.aspx?DocID=L35093&bc=gAAAAAAAAAAAA.

     iv.  The purpose of the date format is to ensure that dates of health care claims such as the date a medical procedure was provided (date of service or "DOS") in comparison to the date of settlement, can be searched, sorted and properly selected as compensable or non-compensable claims.

     v.  In general, ensuring the accuracy of dates, and other data is essential to analyzing claims data files by health insurers and others who may need to determine the value of claims, the relevance of particular claims with respect to patient conditions, dates of care, or whether the claim is compensable.

  b.  <u>Medical Diagnosis and Procedure Codes</u>:

     i.  Diagnosis-Related Group (DRG) – DRGs are a statistical system of classifying any inpatient stay into groups for the purposes of payment. The DRG classification system divides possible diagnoses into more than 20 major body systems and subdivides them into almost 500 groups for the purpose of Medicare reimbursement. Factors used to determine the DRG payment amount include the diagnosis involved as well as the hospital resources necessary to treat the condition.[15][16]

---

[15] Gillian I. Russell, Terminology, in FUNDAMENTALS OF HEALTH LAW 1, 12 (American Health Lawyers Association 5th ed., 2011).

[16] Beginning in 2007, CMS overhauled the DRG system with the development of "severity-adjusted DRGs" and began to replace DRGs with "Medicare-severity DRGs" or "MS-DRGs" through a three-year phase-in period that blended payment under the old DRG system and the MS-DRG system. In a small number of MS-DRGs, classification is also based on the age, gender, and discharge status of the patient. The diagnosis and discharge information is reported by the hospital using codes from the ICD-9-CM or ICD-10-CM if the date of service is on or after October 1, 2015.

ii. International Classification of Diseases (ICD-9 and ICD-10) – Hospitals report diagnosis information using codes from the ICD-9-CM (the International Classification of Diseases, 9th Edition, Clinical Modification if the date of service is before October 1, 2015) or ICD-10 CM (if the date of service is on or after October 1, 2015).

iii. Inpatient medical procedures ICD-9 Volume 2 and Volume 3 and ICD-10 PCS – These codes are used to describe inpatient medical procedures, excluding the physician's bill.

iv. Current Procedural Terminology ("CPT") – CPT[17] codes are a standardized listing of descriptive terms and identifying codes for reporting outpatient medical services and procedures as well as both inpatient and outpatient physician services. The current version, CPT-4, is maintained by the American Medical Association and is an accepted standard by the National Committee on Vital Statistics or NCVHS.[18]

v. Ambulatory Patient Classification (APC) – Services performed in outpatient ambulatory surgery centers may be classified by APCs. CMS assigns individual services to APCs based on similar clinical characteristics

---

[17] CPT codes and descriptions are copyrights of the American Medical Association Current Procedural Terminology.

[18] National Committee on Vital and Health Statistics, Consolidated Health Informatics Initiative, *available at* http://www.ncvhs.hhs.gov/meeting-calendar/agenda-of-the-december-9-10-2003-ncvhs-subcommittee-on-standards-and-security-hearing/consolidated-health-informatics-initiative-final-recommendation-information-sheet-billingfinancial-for-the-december-9-2003-ncvhs-subcommittee-on-standards-and-security-hearing/.

and similar costs.[19]

vi.   Healthcare Common Procedure Coding System (HCPCS) – HCPCS is mainly used to indicate medical supplies, durable medical goods, ambulance services, and durable medical equipment, prosthetics, orthotics and supplies (DMEPOS).[20]

vii.   Medical Data Code Sets – The standard Code set for medical diagnosis and procedure codes in health care claims is a series of digits as specified in 45 C.F.R. § 162.1002.

viii.   The purpose of standard diagnosis code sets is to use a universal terminology in describing patients with certain conditions to determine compensable or non-compensable claims.

3.   Specifically, CMS primarily utilizes two systems of classification: (1) International Classification of Diseases ("ICD-9" and "ICD-10") medical diagnosis codes; and (2) Current Procedural Terminology ("CPT-4") procedure codes. *See* 45 C.F.R. § 162.1002.

---

[19] CMS, Hospital Outpatient Prospective Payment System, Partial Hospitalization services furnished by hospitals or Community Mental Health Centers, Ambulatory Payment System, https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/downloads/HospitalOutpaysysfctsht.pdf.

[20] American Academy of Professional Coders (AAPC), https://www.aapc.com/resources/medical-coding/hcpcs.aspx.

## APPENDIX 2

1.      On April 15, 2014, FHCP irrevocably assigned all rights to recover conditional

payments made on behalf of its enrollees to La Ley Recovery Systems, Inc., ("La Ley Recovery").

The assignment from FHCP to La Ley ("FHCP Assignment") is attached hereto as **Exhibit D**, and

expressly provides:

> [b]y way of this agreement, [FHCP] appoints, directs, and otherwise **assigns** all of
> [FHCP's] rights as it pertains to the rights pursuant to any plan, State or Federal
> statute whatsoever directly and/or indirectly for any its members and/or plan
> participants.

**Ex. D**, *FHCP Assignment § 1.1* (emphasis added).

2.      The agreement authorized La Ley Recovery to assign the agreement to subsequent

entities, so long as that assignment was approved. La Ley Recovery assigned the agreement to

Plaintiff.  *See* Ex**.** E. That assignment agreement provides as follows:

> [La Ley Recovery] hereby irrevocably assigns, transfers, conveys, sets over, and
> delivers to [Plaintiff] or its assigns any and all of [La Ley Recovery]'s rights, title,
> ownership and interest in and to all rights and entitlements, that [La Ley Recovery]
> has, may have had, or has asserted against third parties arising from or relating to
> the Claims.

**Ex. E**, § 1.

3.      Following that assignment, FHCP approved any subsequent assignment from La

Ley Recovery to any then-existing or future MSP Company, which includes Plaintiff.

4.      La Ley Recovery's assignment to MSPA was subsequently approved by FHCP's

receiver through a settlement agreement ("Settlement Agreement") between FHCP, MSP

Recovery LLC, MSP Recovery Services, LLC, and MSPA Claims 1, LLC, La Ley Recovery

Systems Inc., and La Ley Recovery Systems (collectively referred to as the "MSP Companies").

A copy of the Settlement Agreement is attached as **Exhibit F**. In the Settlement Agreement,

FHCP's receiver acknowledged and agreed to the terms and conditions of the FHCP-La Ley Recovery Assignment Agreement. **Ex. F**, Recitals, § 2(a).

5.     On June 14, 2016, the Leon County Circuit Court approved the terms of the Settlement Agreement, specifically finding "that the Settlement Agreement was negotiated in good faith and is in the best interest of Florida Healthcare Plus, Inc.," and retained jurisdiction to enforce the terms of the Settlement Agreement. **Ex. G**, *In Re: The Receivership of Florida Healthcare Plus, Inc.*, Case No. 2014 CA 2762, slip op., (Fla. 2d Cir. Ct. June 14, 2016).

6.     Accordingly, MSPA possesses all of FHCP's subrogation rights to pursue and recover all medical claims, bills, and expenses FHCP provided on behalf of its MA enrollees from and against any liable primary payer, including Defendant.

7.     On June 26, 2019, AvMed, Inc. ("AVDI") entered into a Claims Purchase Agreement & Assignment with Series 17-03-615, a designated series of MSP Recovery Claims, Series LLC, whereby it irrevocably assigned all rights to recover conditional payments made on behalf of its enrollees (the "AvMed Assignment"). The AvMed Assignment is attached hereto as **Exhibit H**, and expressly provides, in pertinent part:

> Assignor irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its designated series, successors and assigns, any and all of Assignor's right, title, ownership and interest in and to (i) all Claims existing on the date hereof, whether based in contract, tort, or statutory right, and all related recovery arising from and related to the claims data transferred to MSP Recovery (or its affiliates or service providers, including MSP Recovery, LLC), and (ii) any and all causes of action, claims and demands of any nature whatsoever relating to payments for health care services provided to Assignor's members and enrollees, and legal or equitable rights (including, but not limited to, subrogation) to pursue and/or recover monies related to the Claims; and (iii) all causes of actions, claims, rights and demands of any nature whatsoever, legal or equitable, against primary payers, Responsible Parties and/or third parties that may be liable to Assignor arising from or relating to the Claims . . . The assignment of the Assigned Claims set forth herein is irrevocable and absolute.

**Ex. H**, at § 1.1.1.

8.      The AvMed Assignment contemplated that the Parties would also enter into a separate "Stand-Alone Assignment Agreement" further evidencing the AvMed Assignment. **Ex. H**, at § 6.1.

9.      The AvMed Assignment also provided for a due diligence period wherein the Parties would provide various deliverables to each other and, at the conclusion of which, the compensation amount would be delivered and various transaction documents – including but not limited to the AvMed Assignment and the Stand-Alone Assignment Agreement – would be released from escrow. **Ex. H**, at § 3.2.

10.      Following execution of the AvMed Assignment, the Parties mutually agreed to extend the due diligence period several times. Upon completion of the due diligence period and satisfaction of the various deliverables and agreed upon conditions, the Parties finalized the transaction, including exchanging compensation and final transaction documents. The stand-alone assignment is attached hereto as **Exhibit I**.